Case No. 25-50160

# In the United States Court of Appeals
# for the Fifth Circuit

———— ◆ ————

Judy Harward; Brent Harward; 3325 Westlake Owners, L.L.C.;
Kirk Fritschen, as trustee of the 3705 Westlake Trust;
4200 Rivercrest, L.L.C.; et al.,

*Plaintiffs–Appellants,*

v.

City of Austin,

*Defendant–Appellee.*

———— ◆ ————

Appeal from Case No. 1:21-CV-00095
in the United States District Court
for the Western District of Texas

———— ◆ ————

**APPELLANTS' BRIEF**

———— ◆ ————

| | |
|---|---|
| Ernest A. Young | Christopher S. Johns |
| 3208 Fox Terrace Drive | *Counsel of Record* |
| Apex, North Carolina 27502 | Bill Cobb |
| 919-360-7718 | Michael C. Cotton |
| young@law.duke.edu | COBB & JOHNS PLLC |
| | 13341 West US-290, Building 2 |
| | Austin, Texas 78737 |
| | 512-399-3150 |
| | chris@cobbjohns.com |

*Counsel for Plaintiffs–Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-50160

Judy Harward; Brent Harward; 3325 Westlake Owners, L.L.C.;
Kirk Fritschen, as trustee of the 3705 Westlake Trust;
4200 Rivercrest, L.L.C.; et al.
v.
City of Austin

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of the Court may evaluate possible disqualification or recusal.

**Landowner Plaintiffs-Appellants**
c/o Christopher S. Johns
COBB & JOHNS PLLC
13341 West US-290, Building 2
Austin, Texas 78737
512-399-3150
512-572-8005 fax
chris@cobbjohns.com

*Landowner Plaintiffs-Appellants own property along the shores of Lake Austin. They are seeking a determination that their properties are not in the City of Austin's full-purpose jurisdiction.*

ii

**City of Austin, Texas**
c/o Hannah M. Vahl
CITY OF AUSTIN LAW DEPARTMENT
P. O. Box 1546
Austin, Texas 78167
512-974-2346
512-974-1311 fax
hannah.vahl@austintexas.gov

*The City of Austin, Texas asserted full-purpose jurisdiction over the properties owned by Landowner Plaintiffs-Appellants beginning in 2019.*

        */s/ Christopher S. Johns*
        Christopher S. Johns

        *Attorney of Record for Plaintiffs–Appellants*

iii

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff-Appellant Homeowners believe oral argument would aid the Court in evaluating the important questions regarding the ability of citizens to vindicate federal constitutional rights in federal court. The district court dismissed the Homeowners' claims here on *Pullman* abstention, even though the City failed to identify any difficult and unclear question of state law that would impact the Homeowners' federal claims. Because the district court's erroneous holding radically expands the bounds of *Pullman* abstention, the Homeowners respectfully submit that this appeal merits oral argument and full Class III treatment.

## TABLE OF CONTENTS

Certificate of Interested Persons ..................................................................ii

Statement Regarding Oral Argument ...........................................................iv

Table of Contents ...........................................................................................v

Table of Authorities .....................................................................................vii

Jurisdictional Statement ...............................................................................xi

Statement of the Issue ..................................................................................xii

Introduction ................................................................................................... 1

Statement of the Case ................................................................................... 3

Standard of Review .......................................................................................9

Summary of the Argument............................................................................9

Argument.....................................................................................................12

I.    *Pullman* abstention cannot apply, as there is not a single state-law issue that would eliminate the need to reach the Homeowners' constitutional questions ........................................... 15

    A.    State law is clear that the Shoreline Properties were not in the City's full-purpose jurisdiction before the 2019 Ordinance ....................................................................... 17

    B.    The R&R identified three supposedly uncertain questions of state law, but those questions are either completely irrelevant to the Homeowners' federal claims or clear on their face............................................................... 21

    C.    The City's theory of this case would make *Pullman* the rule, not the exception .......................................................30

II. The totality of the circumstances strongly weighs against abstention .................................................................. 35

Conclusion .......................................................................... 41

Certificate of Service ........................................................... 43

Certificate of Compliance ................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Allegheny County v. Frank Mashuda Co.*,
     360 U.S. 185 (1959) ........................................................................ 14

*Ankenbrandt v. Richards*,
     504 U.S. 689 (1992) ....................................................................... 14

*Baggett v. Bullitt*,
     377 U.S. 360 (1964) ....................................................................... 35

*Bailey v. Travis Cent. Appr. Dist.*,
     No. D-1-GN-20-006182
     (53rd Dist. Ct., Travis County, Tex. Jan. 26, 2021) .................... 36–37

*Baran v. Port of Beaumont Nav. Dist.*,
     57 F.3d 436 (5th Cir. 1995) ........................................................ *passim*

*Bd. of Adjustment v. Wende*,
     92 S.W.3d 424 (Tex. 2002) ............................................................. 26

*Begum v. Miner*,
     213 F.3d 639 (5th Cir. 2000) .......................................................... 14

*Bellotti v. Baird*,
     428 U.S. 132 (1976) ....................................................................... 36

*Burlington N. R. Co. v. Harvey*,
     717 S.W.2d 371
     (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) .............. 25

*Cameron Appr. Dist. v. Rourk*,
     194 S.W.3d 501 (Tex. 2006) ............................................................. 8

*Cingular Wireless, LLC v. Thurston Cnty.*,
     150 Fed. App'x 633 (9th Cir. 2005) ................................................ 31

*City of Houston v. Hill,*
    482 U.S. 451 (1987).....................................................................*passim*

*El Paso Cnty. v. El Paso Cnty. Emerg. Servs. Dist. No. 1,*
    622 S.W.3d 25 (Tex. App.—El Paso 2020, no pet.) ........................28

*FBI v. Fikre,*
    601 U.S. 234 (2024) ...................................................................... 15

*First Am. Title Ins. Co. v. Adams,*
    829 S.W.2d 356
    (Tex. App.—Corpus Christi-Edinburg 1992, writ denied) ..............25

*Grace Ranch, L.L.C. v. BP Am. Prod. Co.,*
    989 F.3d 301 (5th Cir. 2021).................................................30–31, 32

*Griffin v. Cnty. Sch. Bd.,*
    377 U.S. 218 (1964) ...................................................................... 36

*Guiney v. Roache,*
    654 F. Supp. 1287 (D. Mass. 1987)............................................. 38–39

*Hartford Ins. Co. v. Crain,*
    246 S.W.3d 374 (Tex. App.—Austin 2008, pet. denied).................25

*Harward v. City of Austin,*
    84 F.4th 319 (5th Cir. 2023) ...........................................................8

*Haw. Hous. Auth. v. Midkiff,*
    467 U.S. 229 (1984) ..................................................................*passim*

*Hillsborough Township v. Cromwell,*
    326 U.S. 620 (1946) ...................................................................... 39

*Knick v. Township of Scott,*
    588 U.S. 180 (2019) ........................................................................9

*Lexmark Int'l, Inc. v. Static Ctrl. Comps., Inc.,*
    572 U.S. 118 (2014)...................................................................... 15

*La. Debating & Literary Ass'n v. City of New Orleans,*
    42 F.3d 1483 (5th Cir. 1995).......................................................31, 35

*Mata v. Lynch*,
  576 U.S. 143 (2015) ................................................................ 15

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)..........................................................12, 19

*Mayor of City of Philadelphia v. Educ. Equality League*,
  415 U.S. 605 (1974) ............................................................... 36

*McDonald v. City of W. Branch*,
  466 U.S. 284 (1984) ............................................................... 13

*Moore v. Sims*,
  442 U.S. 415 (1979).................................................................40

*Nasser v. City of Homewood*,
  671 F.2d 432 (11th Cir. 1982) ............................................... 15

*Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm. of State Bar of Tex.*,
  283 F.3d 650 (5th Cir. 2002)......................................9, 17, 22

*Sprint Commc'ns, Inc. v. Jacobs*,
  571 U.S. 69 (2013)................................................... 14, 15, 37

*Trawalter v. Schaefer*,
  179 S.W.2d 765 (Tex. 1944) ..................................................25

*United Fence & Guard Rail Corp. v. Cuomo*,
  878 F.2d 588 (2d Cir. 1989) ..................................................15

*Weiss v. State*,
  No. 05-07-00680-CR, 2008 WL 444483
  (Tex. App.—Dallas Feb. 20, 2008, no pet.) ..................... 25–26

*Zwickler v. Koota*,
  389 U.S. 241 (1967)........................................................ 9, 13

**Constitutions, Statutes, and Charters**

42 U.S.C. § 1983 ................................................................ 9, 13

AUSTIN, TEX. CITY CHARTER art. I ........................................... 17

TEX. LOC. GOV'T CODE § 42 ...................................................... 4

TEX. LOC. GOV'T CODE § 43 ............................................... *passim*

TEX. LOC. GOV'T CODE § 51 ...................................................... 4

TEX. TAX CODE § 6 .................................................................... 8

TEX. TAX CODE § 25 .............................................................. 8, 39

TEX. TAX CODE § 41 .............................................................. 8, 39

U.S. CONST. amend. V ............................................................ 16

U.S. CONST. amend. XIV ..................................................... 16, 20

U.S. CONST. art. 1 ................................................................. 16

**Other Materials**

WRIGHT & MILLER, AVOIDANCE OF FEDERAL CONSTITUTIONAL
    QUESTIONS—WHEN ABSTENTION REQUIRED,
    17A FED. PRAC. & PROC. JURIS. § 4242 (3d ed.) ............................... 38

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this case includes causes of action "arising under the Constitution, laws, or treaties of the United States." The district court also had jurisdiction under 28 U.S.C. § 1343(a)(3) because the Plaintiff-Appellant Homeowners seek to redress the deprivation of federal constitutional rights under color of state law. Given these bases for original federal jurisdiction, the district court had supplemental jurisdiction over the Homeowners' state-law claims as well. *See* 28 U.S.C. § 1367. This Court has appellate jurisdiction because the district court's dismissal of the Homeowners' case is a "final decision" for purposes of 28 U.S.C. § 1291.

The district court entered a final judgment dismissing the Homeowners' case without prejudice on February 10, 2025. ROA.2885. The Homeowners timely filed their notice of appeal on March 3, 2025. ROA.2886–88; FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUE

*Pullman* abstention is appropriate only when there are "difficult and unsettled questions of state law" that are "obviously susceptible to a limiting construction" that would "render unnecessary" adjudication of the federal constitutional claim. Even then, courts must evaluate the "totality of the circumstances" before abstaining under *Pullman*, considering the rights at stake and the harms of cost and delay. Here, state law is clear on the only questions that would matter. Indeed, the Homeowners would still have valid federal claims no matter how the federal district court answered the state-law questions, making *Pullman* abstention improper. Further, this five-year-old dispute is already in its second forum, and the costs of further delay—and a third lawsuit in a third forum—are substantial.

The Homeowners ask this Court to answer whether the district court properly exercised *Pullman* abstention where (1) the answers to the state-law questions would not obviate the need for a ruling on the Homeowners' federal constitutional claims and (2) the harms of cost and delay far outweigh any perceived benefit of abstention.

## INTRODUCTION

The property owners in this case (the Homeowners) contend that the City of Austin unconstitutionally annexed their properties into the City's *full-purpose* jurisdiction, where their land could be fully regulated and taxed. Faced with several inconvenient Texas laws that prevented lawful annexation of the Homeowners' land, in 2019 the City instead passed an ordinance that repealed a 1986 ordinance declaring their properties were within the City's *limited-purpose* jurisdiction, where clear Texas law prohibits full regulation and taxation. Inexplicably, the City simply claimed—and its 2019 ordinance falsely recites—that the Homeowners' properties have been in the City "at all times since 1891."

Adopting the magistrate judge's report and recommendation (R&R), the district court has now twice refused to reach the merits of the property Homeowners' federal claims—the first time relying on the Tax Injunction Act and this time on *Pullman* abstention. But *Pullman* requires difficult questions of state law that, once answered, would likely obviate the need to reach a plaintiff's federal claims.

While the City failed to identify a single such question, the R&R suggested three state-law issues to justify dismissal based on *Pullman*:

1

(1) whether the supposed extension of the City's boundaries in the 1928 and 1938 City charters was improper because the City did not perform a survey; (2) whether the City's 1986 Ordinance impacted the jurisdictional status of the Shoreline Properties; and (3) whether the 1986 Ordinance violated the Texas Constitution.

These questions are not difficult, nor would the answers to any of these questions dispose of the Homeowners' federal claims. In all events, the Homeowners' properties were outside the City's full-purpose jurisdiction in 2019, and the Homeowners were entitled to, but did not receive, basic constitutional protections when the City abridged their property rights in 2019.

Thus, no matter how the courts answer the R&R's state-law questions, the answers to those questions will not moot the Homeowners' federal claims: namely, whether the City's 2019 actions violated the Homeowners' constitutional rights to notice, an opportunity to be heard, protection against retroactive legislation changing their properties' legal status, and equal protection of the laws with respect to the provision of municipal services.

What's more, even when (unlike here) the initial criteria for abstention are satisfied, federal courts must evaluate the totality of the circumstances, as the harms of abstention often far outweigh any perceived benefits. That factor, which the R&R glosses over, screams against abstention here. This case began nearly five years ago. The Homeowners have litigated their claims before a state court, a federal magistrate judge, a federal district judge, and this Court (now twice). The Homeowners should not be forced to file a third lawsuit in a third forum after five years, just because the City thinks its own past actions are confusing.

Because *Pullman* abstention is unwarranted, the Homeowners ask the Court to reverse the judgment and order the district court to reach the merits of their claims.

## STATEMENT OF THE CASE

The Homeowners' properties (Shoreline Properties) sit on the shores of Lake Austin—a roughly 21-mile stretch of the Colorado River between Tom Miller Dam and Mansfield Dam. As of 2019, when the City took its unlawful actions here, the Shoreline Properties had never been within the

City's full-purpose jurisdiction.[1] As part of the City's "special purpose" jurisdiction, they are subject to limited forms of regulation, primarily for purposes of flood control. But they had never been taxed or fully regulated by the City, and the City had never provided—and still does not provide—basic municipal services.[2]

The relevant history of this case begins in 1891, when the Texas Legislature extended the western boundary of the City of Austin to include thin strips of land along the shoreline of the Colorado River. ROA.1204–8

---

[1] In Texas, home-rule cities have three types of jurisdiction: (1) full-purpose jurisdiction, in which the city has full regulatory and taxation authority, TEX. LOC. GOV'T CODE § 51.072; (2) limited-purpose jurisdiction, in which the city cannot tax properties, and need not provide full city services, but maintains some regulatory authority, *see id.* §§ 43.121, 43.130; and (3) extraterritorial jurisdiction, in which the city cannot tax property and enjoys very limited regulatory powers, *see id.* §§ 42.001, 42.021, 42.902. For the sake of this case, the City would need to show (but cannot show) that it had full-purpose jurisdiction over the Shoreline Properties, as this is the only type of jurisdiction that would have permitted the City to tax and assert full regulatory powers over these properties.

[2] The vast majority of the Homeowners have never received water from the City. ROA.1222, 2532–33, 2557. They provide and maintain their own water treatment systems, pumps, and transmission lines—pulling water from wells or from the lake. ROA.2532–33, 2541. Likewise, most Homeowners do not receive city wastewater services because there are no wastewater lines, lift stations, or other needed infrastructure to collect wastewater ROA.1222, 2533. Instead, the Homeowners generally pay for and maintain their own septic systems. ROA.2533, 2541. They also do not receive City trash collection services, so they pay private trash collectors. *Id.* The City likewise does not provide fire hydrants in the Homeowners' neighborhoods, and the Homeowners cannot depend on the City for fire, police, or emergency services, as response times for emergencies are far too slow. *Id.* The Homeowners have learned to rely on each other—not the City—when emergencies strike.

(Act of April 3, 1891, 22nd R.S., ch. 22, § 2, 1891 Tex. Gen. Laws 101, 101–02). A year before, the City had begun construction on the first Austin Dam on the Colorado, hoping to tame the flood-prone river and capture its energy for electricity. To ensure that the City had jurisdiction over the dam and authority to regulate the river upstream, the Legislature set the City's boundary line "10 varas" (or 27.78 feet) from the ordinary water level on each bank, to be marked "after completion of the dam now being constructed[.]" ROA.2519; ROA.1207 (Act of April 3, 1891, 22nd R.S., ch. 22, § 2, 1891 Tex. Gen. Laws 101, 101-02).

The Legislature reaffirmed the 10-vara line as the City's boundary in 1909. ROA.1276–88 (Act of Feb. 3, 1909, ch. 2, art. I, § 2, 1909 Tex. Gen. Laws 8, 9–10). In 1926, the City adopted its first home-rule charter, using the same 10-vara line set by the Legislature in 1891. ROA.1304–07. Today, because the current Tom Miller Dam (completed in 1940) substantially raised the water level of the lake, the Shoreline Properties lie either completely or largely outside the 10-vara line, and the City has never suggested otherwise.

In 1928, the City amended its charter, purporting to expand its boundaries (at least for limited purposes) from the 10-vara line to a contour

5

line "504.9′ above mean sea level" on both banks of the river. ROA.2520–21. This boundary remained in the 1938 Charter. ROA.2520-22.

But in its 1953 Charter, the City reaffirmed the Legislature's original 10-vara line as the City's boundary, repealing the 504.9′-contour-line language found in the 1928 and 1938 charters. ROA.2523. The City reaffirmed this 10-vara line again in 1967 by resolution. ROA.2523–24; ROA.1222 (Austin, Tex., Ordinance 860130-A).

In 1986, after the City auditor erroneously listed the Shoreline Properties on the City's tax roll (for the first time ever), the City passed an ordinance (1) acknowledging the "error," (2) "declaring the limited purpose jurisdiction status of all shoreline properties," and (3) recognizing that the properties could not be taxed unless and until the City provided full municipal services. ROA.2528–30; ROA.1222–24 (Austin, Tex., Ordinance 860130-A (Jan. 30, 1986)).

In 2018, the City considered annexing the Shoreline Properties for full regulatory and taxing purposes, but a study by Austin Water revealed that it would take five to seven years and "$11 million to $17 million" to provide water and wastewater services *only* to the Shoreline Properties located on Manana Street. ROA.2532–33. Austin Water's director concluded that the

"cost to serve numbers crush the revenues." *Id.* The City thus decided not to annex the Shoreline Properties.

But City Council caved to political pressure in 2019, after the Austin American-Statesman published a misleading article complaining of a "lakefront tax break" for "mansions on Lake Austin." ROA.1176, 1179, 1197, 2533. In response, City Council was determined to regulate and tax these properties. But annexation was not possible. The Legislature had just passed a law requiring property owner consent for most municipal annexations. *See* 2019 Tex. Sess. Law Serv. Ch. 155 (H.B. 347) (codified in Chapter 43 of Texas Local Government Code). And the City knew the Homeowners would never give their consent.

Instead, City Council decided it would be easier to simply rewrite history. Through its 2019 Ordinance, City Council repealed the 1986 Ordinance, declaring that (1) the 1986 Ordinance was actually an unconstitutional and illegal tax exemption and (2) the Shoreline properties had been in the City's full-purpose jurisdiction "at all times since 1891." ROA.1268. This was obviously false. The City itself had repeatedly affirmed—including in 1953, 1967, and 1986—that these properties were not within the City's full-purpose jurisdiction.

7

After the City passed the 2019 Ordinance, the City notified Travis Central Appraisal District (TCAD) that the City's taxing-unit boundaries had changed to include the Shoreline Properties. *See* TEX. TAX CODE § 6.07. In October 2020, the Homeowners filed suit, first against TCAD.[3] But the Appraisal Review Board refused to address the Homeowners' claims that the City was not a proper taxing entity, and Texas law clearly bars the City from being made a party in that forum, so this federal court filing followed in January 2021.

The City filed its first motion to dismiss, which the district court granted in September 2022 based on the Tax Injunction Act (TIA). This Court reversed in October 2023. *Harward v. City of Austin*, 84 F.4th 319, 325 (5th Cir. 2023). On remand, the City filed a second motion to dismiss, which the district court granted in February 2025, pursuant to *Pullman* abstention. ROA.2883–84. The Homeowners filed a timely notice of appeal on March 3, 2025. ROA.2886–88.

---

[3] Under Texas law, disputes that involve "identification of the taxing units in which the owner's property is taxable" are governed exclusively by the Texas Tax Code's tax-protest regime. TEX. TAX CODE § 41.41(a)(6). Protests are heard by an Appraisal Review Board (ARB), which by law has exclusive jurisdiction over tax protests. *Id* § 25.22; *see Cameron Appr. Dist. v. Rourk*, 194 S.W.3d 501, 502 (Tex. 2006). Because this suit involves "identification of the taxing units in which the owner's property is taxable" and the tax-protest suit is exclusive, the Homeowners first brought their complaints before the ARB.

## STANDARD OF REVIEW

In abstention cases, this Court applies "a two-tiered standard of review." *Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm. of State Bar of Tex.*, 283 F.3d 650, 652 (5th Cir. 2002). This Court "review[s] a district court's abstention ruling for abuse of discretion," but it "review[s] de novo whether the requirements of a particular abstention doctrine are satisfied." *Id.*

## SUMMARY OF THE ARGUMENT

"The Civil Rights Act of 1871 . . . guarantees a federal forum for claims of unconstitutional treatment at the hands of state officials, and the settled rule is that exhaustion of state remedies is *not* a prerequisite to an action under 42 U.S.C. § 1983." *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019) (internal quotation omitted). This doesn't mean that *Pullman* abstention can never happen in a § 1983 action, but Congress's purpose to guarantee a federal forum requires that "[a]bstention is, of course, the exception and not the rule." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987).[4] *Pullman* abstention is only available "when difficult and unsettled

---

[4] *See also Zwickler v. Koota*, 389 U.S. 241, 247–52 (1967) (emphasizing the duty imposed by § 1983 in rejecting abstention).

questions of state law must be resolved before a substantial federal question can be decided." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). And the statute or ordinance in question must be "obviously susceptible of a limiting construction" that would "render unnecessary" adjudication of the constitutional claims. *City of Houston*, 482 U.S. at 468 (quoting *Harman v. Forssenius*, 380 U.S. 528, 534–35 (1965)). This is not such a case. It's not just that the state-law questions are clear, though they are. It's also that the Homeowners have valid federal claims no matter how the courts answer the state-law questions. The state-law issues raised by the R&R, which the district court adopted, are a meaningless sideshow.

The R&R pointed to four issues of allegedly unclear state law: (1) the interpretation of a 1928 charter, (2) the interpretation of a 1938 charter, (3) the interpretation of the 1986 Ordinance that declared the limited-purpose-jurisdiction status of the Shoreline Properties, and (4) the constitutionality of the 1986 Ordinance. None amounts to a hill of beans under a proper *Pullman* analysis. The City's 1953 charter revoked the 1928 and 1938 charters and confirmed the 10-vara line as Austin's city limits (which now lie underwater, beyond the Shoreline Properties). Neither the City nor the district judge disputed or even addressed this fact. *See*

10

ROA.2811–23, 2853–63. As for the 1986 Ordinance, there are only two possible outcomes: If it applies and is constitutional, then the Shoreline Properties were in the City's limited-purpose jurisdiction and couldn't be taxed and fully regulated without proper annexation to the City's full-purpose jurisdiction; in the alternative, if the 1986 Ordinance is inapplicable or invalid, then the Shoreline Properties remained outside the City pursuant to the City's 1953 charter.

Either way, the Homeowners and their Shoreline Properties were outside the City's full-purpose jurisdiction and could not have their rights abridged in violation of the U.S. Constitution. Thus, no matter the answer to those state-law questions, the district court must still address the Homeowners' federal claims: whether the City's 2019 actions violated their constitutional rights to notice, an opportunity to be heard, protection against retroactive legislation changing their properties' legal status, and equal protection of the laws with respect to the provision of municipal services.

There are no open questions of state law that could moot the Homeowners' claims, but even if there were, this case would be an exceedingly poor vehicle for *Pullman* abstention. *Pullman* requires federal courts to evaluate the "totality of the circumstances" and weigh the harms

11

that abstention poses, especially cost and delay. *Baran v. Port of Beaumont Nav. Dist.*, 57 F.3d 436, 442 (5th Cir. 1995). Here, the circumstances weigh heavily against abstention: No compelling state interest is at stake, as the Homeowners seek to vindicate state law, not challenge it. They have, after all, always acknowledged that compliance with the state-prescribed procedures for annexation would satisfy due process. And the cost of delay here is enormous: This case has already languished for nearly five years in three separate courts without reaching the merits of the Homeowners' claims.

The district court had no credible ground to abstain under *Pullman*. Respectfully, this Court should reverse once again—but this time with instructions for the district court to proceed to the merits of the Homeowners' claims.

## ARGUMENT

State law created the Homeowners' property rights, but federal law requires minimum procedural safeguards—for example, notice and an opportunity to be heard—before the Homeowners can be deprived of those rights. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976). The City of Austin cannot trample over the Homeowners' vested property rights by

annexing them in defiance of any recognized or lawful process, changing their legal status retroactively, imposing regulations and taxes on those illegally annexed properties, and refusing to provide the basic municipal services that the City provides to other similarly situated residents. Such an abuse of power is blatantly unconstitutional and demands federal court attention.

As the Supreme Court has emphasized, 42 U.S.C. § 1983 embodies a strong federal policy favoring adjudication of federal constitutional rights in federal court. *See Knick*, 588 U.S. at 185; *McDonald v. City of W. Branch*, 466 U.S. 284, 290 (1984). Through § 1983, Congress "expand[ed] federal judicial power" and "imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *Zwickler*, 389 U.S. at 248. In fact, "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *McDonald*, 466 U.S. at 290 (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)).

13

Because of that congressional determination, abstention must be reserved for truly exceptional cases. *See Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959). The Supreme Court and this Court have repeatedly made clear that "[a]bstention rarely should be invoked." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992); *Begum v. Miner*, 213 F.3d 639, at *1 (5th Cir. 2000). This Court has cautioned against knee-jerk applications of *Pullman* even when (unlike here) its criteria are clearly satisfied. *Baran*, 57 F.3d at 442. And in recent years, the Supreme Court has only narrowed the scope of the various judge-made abstention doctrines, emphasizing that "[i]n the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

The Supreme Court has stressed that "[f]ederal courts . . . have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Id.* at 77 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). So when a case falls within its jurisdiction, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Id.* (quoting *Colorado River Water Conservation Dist. v. United*

14

*States*, 424 U.S. 800, 817 (1976)).[5] As this Court has instructed, "a district court should abstain from hearing a case with considerable reluctance." *Begum*, 231 F.3d at *1.

For the many reasons explained below, this case is not one of the extraordinary cases in which *Pullman* abstention is even an option.

## I.    *Pullman* abstention cannot apply, as there is not a single state-law issue that would eliminate the need to reach the Homeowners' constitutional questions.

*Pullman* abstention is never permitted unless there are "difficult and unsettled questions of state law" that "must be resolved before a substantial federal constitutional question can be decided." *Midkiff*, 467 U.S. at 236. Those "issues of state law must be substantially uncertain or ambiguous, necessitating a construction by the state supreme court." *Nasser v. City of Homewood*, 671 F.2d 432, 439 (11th Cir. 1982). And "a federal court should abstain only when the chance of error is reasonably certain, and then only when abstention reduces the likelihood of error." *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 595 (2d Cir. 1989).

---

[5] Although *Sprint* involved *Younger* abstention, it relied on *Colorado River*—involving a more general abstention doctrine—and the same "unflagging" obligation language has been cited generally in rejecting prudential arguments against the exercise of federal jurisdiction. *See, e.g., FBI v. Fikre*, 601 U.S. 234, 241 (2024) (mootness); *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (judge-made limit on appeals in immigration cases); *Lexmark Int'l, Inc. v. Static Ctrl. Comps., Inc.*, 572 U.S. 118, 126 (2014) (prudential standing).

15

Before delving into the relevant state law, first consider the Homeowners' constitutional claims.

- The City violated the Due Process Clause because the City deprived the Homeowners of their property interest with no process whatsoever, including no notice and no opportunity to be heard. *See* U.S. CONST. amend. XIV, § 1; ROA.2563–66.

- The City's violated the Constitution's prohibitions against retroactive laws by retroactively changing the legal status of the Homeowners' properties. *See* U.S. CONST. amend. XIV, § 1; U.S. CONST. amend. V; U.S. CONST. art. 1, § 10; ROA.2567–70.

- The City violated the Equal Protection Clause by converting the Homeowners' properties to full-purpose jurisdiction without following the procedures accorded to other similarly situated residents. *See* U.S. CONST. amend. XIV, § 1; ROA.2570–71.

- The City violated the Equal Protection Clause by denying the Homeowners the municipal services that it provides to other similarly situated residents. *See* U.S. CONST. amend. XIV, § 1; ROA.2571–72.

- The City violated the Due Process Clause's prohibition on vague laws by failing to provide a survey (or equivalent) showing the Homeowners how much of their properties are now allegedly in the City. *See* U.S. CONST. amend. XIV, § 1; ROA.2566–67.[6]

---

[6] None of the Homeowners' constitutional claims hinge on the City's violations of state law. State law does provide safeguards for annexation and the provision of services that would have satisfied constitutional standards. But the City, in addition to ignoring state law, followed no process at all—provided no notice or hearing—and left the Homeowners with a retroactive result. The City also arbitrarily treated the Homeowners' differently than other similarly situated residents. Thus, the City's actions violated the U.S. Constitution in addition to state law.

**A.    State law is clear that the Shoreline Properties were not in the City's full-purpose jurisdiction before the 2019 Ordinance.**

This case presents no difficult and unsettled question of state law that "must be resolved before a substantial federal constitutional question can be decided." *Midkiff*, 467 U.S. at 236. Thus, the *primary* factor for the application of *Pullman* is not met here—an issue this Court reviews *de novo*. *Nationwide*, 283 F.3d at 652.

To begin, there is no dispute over the text or meaning of the 2019 Ordinance—the only ordinance that the Homeowners have challenged in this lawsuit.[7] And "[i]n cases involving a facial challenge" to an ordinance, like here, the "pivotal question" for abstention is whether the challenged ordinance itself (not charters adopted before World War II) is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *City of Houston*, 482 U.S. at 468 (quoting *Harman*, 380 U.S. at 534–35). But the City has never made any argument regarding the text or meaning of the 2019 Ordinance, or offered

---

[7] There is likewise no dispute as to the state-law requirements for municipal annexation. *See generally* TEX. LOC. GOV'T CODE §§ 43.052–43.065; AUSTIN, TEX. CITY CHARTER art. I, § 6. And there is no dispute that the 2019 Ordinance failed to follow those state-law annexation procedures. The City has never suggested otherwise.

any competing interpretations of it. That's because the 2019 Ordinance is clear on its face: It declared the Shoreline Properties were within the City's full-purpose jurisdiction and should be fully regulated and taxed as such. ROA.1268. The only issue relevant to the Homeowners' constitutional claims is whether the City enacted the 2019 Ordinance without offending the Homeowners' federal constitutional rights.

And that issue can be resolved by asking a simple question: What was the jurisdictional status of the Shoreline Properties *immediately before* the 2019 Ordinance? Were those properties *already* in the City's full-purpose jurisdiction, as the City claims. Or, as the Homeowners have argued, were the Shoreline Properties *outside* of the City's full-purpose jurisdiction, such that the City was required to provide minimum constitutional procedures before abridging the Homeowners' property rights? On this simple question, the law could not be clearer. And no one needs to dust off city charters from a century ago to find the answer.

First, consider the City's last ordinance regarding the jurisdictional status of the Shoreline Properties before the passage of the 2019 Ordinance. In 1986, the City passed an ordinance "declaring the *limited purpose jurisdiction* status of all shoreline properties." ROA.1222 (Austin, Tex.,

18

Ordinance 860130-A) (emphasis added). Whatever the status of the Shoreline Properties before the 1986 Ordinance, the Shoreline Properties became part of the City's *limited-purpose* jurisdiction once the 1986 Ordinance was enacted. Under crystal-clear state law, the consequences of baptizing the Shoreline Properties with "limited purpose jurisdiction status" were obvious to anyone who could read a statute: The City was barred from fully regulating and taxing the properties and, in turn, did not have to provide them with full municipal services. *See* TEX. LOC. GOV'T CODE §§ 43.121, 43.130.

The City has not identified a single ordinance or other source of law passed *after* the 1986 Ordinance that would have brought the Shoreline Properties into the City's *full-purpose* jurisdiction. Nor can it. And because the Shoreline Properties were not in the City's full-purpose jurisdiction before 2019, the City was required to follow constitutionally permissible procedures in annexing the Shoreline Properties to its full-purpose jurisdiction. *See Mathews v. Eldridge*, 424 U.S. at 319, 332–33.[8] In short, if the

---

[8] What's more, even if the City had properly annexed the Shoreline Properties, it would have been required to provide full municipal services to these properties. *See* TEX. LOC. GOV'T CODE § 43.065. It has not. This failure—the City's attempts to have its cake and eat it too—violated the Constitution's guarantee of due process and equal protection, on

1986 Ordinance did what it said it did—place the Shoreline Properties in the City's *limited-purpose* jurisdiction—the City's entire case for abstention falls apart.

The City hopes to muddy the waters by questioning whether the 1986 Ordinance actually placed the Shoreline Properties in the City's limited-purpose jurisdiction (*see infra*, Part I.B), but even if the City is correct, that would only mean that before the City passed the 2019 Ordinance, the Shoreline Properties were outside the City altogether. In 1953, the City amended its charter to reconfirm its original boundaries along the 10-vara line. ROA.1304–07.[9] And that boundary line would place the Shoreline Properties outside of the City (which the City has never disputed). ROA.1211–12. City Council then reaffirmed the 10-vara line, and concluded that the Shoreline Properties were outside of the City completely, in a 1967

---

top of state law. *See* U.S. CONST. amend. XIV, § 1; TEX. LOC. GOV'T CODE §§ 43.052–43.065.

[9] In 1952, the City passed an ordinance ordering an election to adopt or reject amendments to its charter, and the first proposed amendment expressly repealed Art. I, Section II (the boundaries as amended in 1928). Austin, Tex., Ordinance (December 31, 1952). That amendment was adopted as Art. I, Section I of the 1953 Charter and reconfirmed the City's boundary line "as established by Chapter 90, page 634, Special Laws of Texas, 1909, 31st Legislature, and as extended by ordinances of the City of Austin subsequent thereto." ROA.1304–07. In 1909, the Legislature had set the boundaries of the City at the 10-vara line, not the 504.9′ contour line. Act of February 3, 1909, 31st R.S., ch. 2, 1909 Tex. Gen. Laws 8.

City resolution. ROA.1220. The City has yet to identify a single annexation ordinance, charter, statute, or any source of law between 1953 and 2019 that would have placed the Shoreline Properties in its full-purpose jurisdiction.

In short, whether the Shoreline Properties are in the City's limited-purpose jurisdiction (under the 1986 Ordinance) or outside the City altogether (under the 1953 Charter), the Homeowners have asserted valid federal constitutional challenges to the City's assertion of *full* jurisdictional control over them: lack of notice (due process), lack of an opportunity to be heard (due process), illegal retroactive change to the legal status of their properties (due process, ex post facto, and/or takings issues), and disparate treatment in the provision of municipal services (equal protection). Neither the district court nor the City have pointed to a single open question of state law that could have any bearing on these constitutional claims.

### B. The R&R identified three supposedly uncertain questions of state law, but those questions are either completely irrelevant to the Homeowners' federal claims or clear on their face.

*Pullman* abstention is never justified simply because there are open questions of state law. *City of Houston*, 482 U.S. at 468. Those difficult and uncertain questions must also be "fairly subject to an interpretation which will render unnecessary adjudication of the federal constitutional question."

21

*Midkiff*, 467 U.S. at 236. Yet here, the R&R did not identify a single open question of state law that could be interpreted in a way that would eliminate the need to reach the Homeowners' constitutional claims. *See id.* This *Pullman* requirement is thus not satisfied—another issue this Court reviews *de novo*. *Nationwide*, 283 F.3d at 652.

In recommending abstention, the R&R identified three supposedly open questions regarding past ordinances and charters:

- whether the supposed extension of the City's boundaries in the 1928 and 1938 City charters was improper because the City did not perform a survey;

- whether the 1986 Ordinance impacted the jurisdictional status of the Shoreline Properties; and

- whether the 1986 Ordinance violated the Texas Constitution. ROA.2818.

But none of these charters or ordinances could be interpreted in a way that would obviate the need to reach the Homeowners' claims; after all, these municipal acts are either clear on their face or are completely irrelevant to the Homeowners' federal claims.

*First, the 1928 and 1938 City Charters are irrelevant.* The R&R claimed that *Pullman* abstention is required because it is unclear whether the extension of the City's boundaries through the 1928 and 1938 charters was improper without a survey. ROA.2818. The R&R did not attempt to explain

22

how resolving this survey problem would eliminate the need to reach the Homeowners' federal questions. Nor could it. That's because the City's 1928 and 1938 charter amendments were *revoked* by the City itself in 1953. ROA.2523.

The City's 1953 Charter reconfirmed the City's *original* boundaries along the 10-vara line, definitively placing the Shoreline Properties outside the City. ROA.1211–12. And City Council confirmed this boundary in 1967. ROA.2526-27. Neither the City nor the magistrate judge has pointed to a single ordinance or other source of law passed between 1953 and 2019 that would have placed the Shoreline Properties within the City's full-purpose jurisdiction. While the 1928 and 1938 charters may be unclear in some

respects[10] and racist in others,[11] their repeal renders them irrelevant to the *Pullman* analysis.

*Second, the 1986 Ordinance placed the Shoreline Properties in the City's limited-purpose jurisdiction.* The R&R devoted one sentence to the 1986 Ordinance. The magistrate judge queried whether the ordinance *actually* declared the limited-purpose jurisdiction status of the Shoreline Properties (despite the title "declaring the limited purpose jurisdiction status of the shoreline properties"), because the ordinance allegedly "never

---

[10] There is a whole host of reasons (survey problems least among them) why the 1928 and 1938 charters never placed the Shoreline Properties within the City's full-purpose jurisdiction. For example, consider the 1913 Strip Act, under which the 1928 annexation would have occurred. That Strip Act was passed to provide large cities "situated upon navigable streams, the authority and power to efficiently provide navigation, wharfage and facilities" and to "regulate same." Act approved March 17, 1913, 33rd R.S., ch. 25, § 1, 1913 Tex. Gen. Laws 47, 47-48. The Act clearly distinguishes land along the navigable stream "*and within the general city boundaries or limits*" from land inside the extended boundary but *outside* the general city limits. *Id.* (emphasis added). Cities had "no right to tax property over which such boundaries are extended, unless such property be within the line *and* within general city boundaries or limits." *Id.* (emphasis added). The Legislature never intended for strips of land up to 20 miles from a city's general boundary line to be part of the city's full jurisdiction, and the City never believed these properties fell within its general boundary. Even assuming that (1) the 1928 and 1938 charters validly set the extended boundary at the 504.9′ contour line along the Colorado River and (2) portions of the Homeowners' properties fall within that line, the City never taxed or fully regulated these properties because they were miles upstream from the general boundary line and were clearly outside the City's full jurisdiction.

[11] The 1928 charter and the 1928 City Plan were adopted as part of another unconstitutional scheme—to "solve the racial segregation problem" that could not "be solved legally under any zoning law known to us at present." 1928 City Plan, p. 57 available at https://en.wikipedia.org/wiki/1928_Austin_city_plan. The City's solution: create a special district and have "all facilities and conveniences be provided to the negroes in this district, as an incentive to draw the negro population to this area." *Id.*

24

refers to the status of the properties within the text of the ordinance itself."
ROA.2818. First, as explained above, this issue is simply irrelevant. *See supra*, Part I.A. If the 1986 Ordinance had no impact on the jurisdictional status of the Shoreline Properties, those properties would have remained outside the City completely under the 1953 Charter. ROA.1304-07. But the R&R is also flat wrong about the text of the ordinance.

Under Texas law, an ordinance's title *is* part of the text of the ordinance and must be respected and considered in determining legislative purpose. As the Supreme Court of Texas and other Texas courts have explained, "[i]t is well settled as a rule of statutory construction . . . that it is proper to look to all parts of a legislative Act to ascertain its proper construction and meaning," including the "caption" and the "body." *Trawalter v. Schaefer*, 179 S.W.2d 765, 767 (Tex. 1944).[12] This interpretive rule applies equally to ordinances because Texas courts "interpret ordinances and statutes under the same rules of construction." *Weiss v. State*, No. 05-07-00680-CR, 2008 WL 444483, at *2 (Tex. App.—Dallas

---

[12] *See also Burlington N. R. Co. v. Harvey*, 717 S.W.2d 371, 375 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (explaining that Texas courts look to "titles and headings" to determine legislative intent); *First Am. Title Ins. Co. v. Adams*, 829 S.W.2d 356, 362 (Tex. App.—Corpus Christi-Edinburg 1992, writ denied) (same); *Hartford Ins. Co. v. Crain*, 246 S.W.3d 374, 378 (Tex. App.—Austin 2008, pet. denied) (same).

25

Feb. 20, 2008, no pet.); *Bd. of Adjustment v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002).

Moreover, after declaring the Shoreline Properties' limited-purpose status, the rest of the 1986 Ordinance explains, at length, *why* the Shoreline Properties are not in the City's full-purpose jurisdiction by analyzing *all* of the most salient factors related to an area's jurisdictional status within a municipality. ROA.1222–23. The ordinance says that it was passed in part to clarify the "status of voting rights of the residents living along the Lake Austin shoreline." ROA.1222. The ordinance emphasizes that the Shoreline Properties have received only the municipal services that are "normally provided in *limited purpose jurisdiction areas.*" *Id* (emphasis added). Indeed, the ordinance even explains that the Shoreline Properties have not received "comparable municipal services" to properties within the City's full-purpose jurisdiction "because of the difficulty in economically providing such services." *Id*. The ordinance also says that the Shoreline Properties enjoy a "status" of having never been taxed. *Id*. And the ordinance concludes by stating that it was passed "to *clarify the status* of the Lake Austin shoreline properties . . . and to avoid any future confusion over the *respective rights and*

26

*duties* of Lake Austin shoreline residents or the *respective rights and duties* of the City of Austin." ROA.1222–23. (emphasis added).

In short, this ordinance did not randomly "declare the limited-purpose jurisdiction status of the Shoreline Properties" in the title and then abandon the topic in the rest of the ordinance. Top to bottom, the 1986 Ordinance does nothing else but declare that the Shoreline Properties are in the City's limited-purpose jurisdiction, based on (1) how those properties had *always* been taxed (not at all); (2) the municipal services they had historically received (hardly any); and (3) the rights of those residents to vote in municipal elections (limited to certain elections, consistent with limited-purpose-jurisdictional rights under Texas law). ROA.1222–23.

*Third, the 1986 Ordinance did not violate the Texas Constitution.* The R&R questioned whether the 2019 Ordinance might be correct that the 1986 Ordinance violated the Texas Constitution's mandate that "property taxation be equal and uniform." ROA.2818. But this is nonsense, and resolution either way is irrelevant to the Homeowners' federal claims in any event. First, Texas law has long recognized limited-purpose jurisdiction status, in which residents do not pay municipal taxes because (among other reasons) they generally do not receive municipal services. *See, e.g.*, TEX. LOC.

27

GOV'T CODE § 43.130(c). Thus, the 1986 Ordinance would only create a constitutional crisis if it exempted residents in the City's *full-purpose* jurisdiction from paying City taxes.[13]

More important, the R&R did not explain how resolving the constitutionality of the 1986 Ordinance would eliminate the need to adjudicate the Homeowner's federal questions. That's because there is no good explanation. First, no party to this lawsuit asked the district court to declare the 1986 Ordinance unconstitutional. And the City would have no standing to raise such a claim anyway. *El Paso Cnty. v. El Paso Cnty. Emerg. Servs. Dist. No. 1*, 622 S.W.3d 25, 41 (Tex. App.—El Paso 2020, no pet.) ("Texas law is well-settled that municipal corporations and other units of government are not vested with constitutional rights under the Texas or United States Constitutions.").

---

[13] The 1986 Ordinance stated clearly that the Shoreline Properties would be taxed "according to the same tax collection policy which prevailed with regard to said tracts from 1891 through the 1984 tax years" precisely because those properties had only enjoyed the kinds of municipal services "provided in limited jurisdiction areas." ROA.1222 (1986 Ordinance). The ordinance likewise affirmed the "limited-jurisdiction status of the Shoreline Properties." *Id.* Thus, on its face, the 1986 Ordinance did not violate the Texas Constitution unless *all* Texas cities are equally violating the Constitution by not requiring residents in limited-purpose jurisdictions to pay municipal taxes. *See id.*

But even if a court were to *sua sponte* declare the 1986 Ordinance invalid, this would not retroactively relieve the City of its obligations to follow constitutionally permissible procedures in annexing the Shoreline Properties. That would merely return things to the pre-1986 *status quo*— when the Shoreline Properties were outside the City altogether under the City's 1953 Charter.

In sum, neither the City nor the R&R have presented one open question of state law that would obviate the need for adjudication of the Homeowners' constitutional claims.[14]

---

[14] Moreover, even if a court determined that the Shoreline Properties have been in the City's full-purpose jurisdiction since 1891, this would, at most, eliminate two of the Homeowners' constitutional claims. Consider the Homeowners' equal protection claims. The City is providing full municipal services to nearly all its residents—but not the Homeowners. It has targeted out a politically unpopular group for worse treatment than it provides similarly situated residents. For the Homeowners (and the Homeowners alone), the City takes their tax revenue while refusing to provide the most needful and most costly City services. Even if state law allowed this kind of unequal treatment (it doesn't), it would still be unlawful under the U.S. Constitution.

Likewise, the Homeowners have pleaded an unconstitutional vagueness claim, because the City has never provided a survey, map, or functional equivalent that would demonstrate that the Homeowners' properties are within either the 504.9′ contour line *or* the 10-vara line. ROA.2566–67. This claim, just as the Homeowners' equal protection claim, would not be impacted even if the 2019 Ordinance was somehow declared lawful.

29

To illustrate these points, consider the following flowchart:



**Magistrate judge's allegedly unclear state-law questions**

#### C.   The City's theory of this case would make *Pullman* the rule, not the exception.

The City hopes that *Pullman* is an easy escape hatch from federal court, to be unlocked anytime a party can point to an unresolved state-law question. Just as in *Grace Ranch*, the City's entire "argument for abstention

largely turns on the possibility a federal court will have to make an *Erie* guess." *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 315 (5th Cir. 2021), *as revised* (Feb. 26, 2021). But if *Pullman* abstention were proper anytime a party could raise an open question about state law, the *Erie* doctrine would be largely irrelevant, and few cases involving state law would fall under federal jurisdiction. Yet as this Court is well aware, "federal courts hear state law claims all the time," and "frequently decide unsettled questions of state law." *Id.* at 314.

The City believes that *Pullman* is appropriate even where the unsettled question of state law is not "difficult" but rather "seemingly obvious." ROA.2857. That's flat wrong. *Midkiff*, 467 U.S. at 236 (explaining that *Pullman* requires "difficult and unsettled questions of state law"); *Baran*, 57 F.3d at 442 (same). The City's confusion on *Pullman* is perhaps why, in its motion to dismiss, the City did not even bother to say which specific statute or ordinance was so opaque that *Pullman* was warranted. *See* ROA.2581-602.[15] Indeed, the City's *only* suggestion of unclear state law was

---

[15] This alone should have been fatal to the City's *Pullman* argument. *See Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1492 (5th Cir. 1995) (holding abstention inappropriate where the City of New Orleans "failed to identify . . . any ambiguity" in the law); *Cingular Wireless, LLC v. Thurston Cnty.*, 150 Fed. App'x 633, 636 (9th Cir. 2005) (holding abstention inappropriate where county had not

a vague assertion that the Homeowners' claims "rest on interpretation and reconciliation of *various state and local annexation legislation* dating back to 1891." ROA.2589 (emphasis added).[16]

Both this Court and the Supreme Court have repeatedly emphasized that abstention is not appropriate simply because "state courts have not had an opportunity to construe the statute." *See City of Houston*, 483 U.S. at 469; *Grace Ranch*, 989 F.3d at 315. But in the City's view, *Pullman* is satisfied anytime the City can think up questions that "Texas state courts have never resolved and are therefore 'unsettled.'" ROA.2856.

For example, after the Homeowners filed objections to the R&R, the City finally came up with a list of five allegedly open questions of state law— all its own past ordinances and charters. *Id.* But the City declined to explain how any one of those supposedly open questions could possibly be resolved in the City's favor or how any of these issues would obviate the need to resolve the Homeowners' federal constitutional claims. *Id.* For example, in one short bullet point, the City raised the question of whether the 1953

"identified a *particular* issue of state or local law that would control the outcome" of the constitutional claim (emphasis added)).

[16] Likewise, in the City's reply, the most specific assertion of "unclear" state law under *Pullman* was a bald statement that "the legal status of [the Homeowners'] properties as a result of *various legislation*" is not "clear." ROA.2774–75 (emphasis added).

Charter actually excluded the Shoreline Properties from the City's boundaries. ROA.2857. Yet the City did not explain how there could be two ways to read that Charter, which unequivocally placed the City's boundaries at the 10-vara line. ROA.1307, 1276-80.

In fact, the City did not once discuss the text of the 1953 Charter—or even quote a single word from it. ROA.2581–602, 2853–63. The City believes it can create a cloud of uncertainty with vague and enigmatic references to a 70-year-old charter, without actually explaining what mysteries lie hidden in that charter, or how it could be read in any other way than its plain, ordinary meaning. *Cf. Baran*, 57 F.3d at 443 (holding abstention not applicable where the party "offer[ed] no credible argument or interpretation of [the] statute to support their abstention argument").

The City followed the same playbook by pointing to four other municipal ordinances in its response to the Homeowners' objections to the R&R. With one exception, the City did not analyze (or even quote from) the text of these allegedly "unclear" ordinances, or explain how there is "obviously" a way to read these texts that would eliminate the need to reach

33

the Homeowners' federal claims. *See City of Houston*, 482 U.S. at 468.[17] But much more is needed than identifying unsettled state-law questions for *Pullman* to apply. *Id.* If the statute or ordinance "is not *obviously susceptible* of a limiting construction, then even if the statute has 'never [been] interpreted by a state tribunal[,] it is the duty of the federal court to exercise its properly invoked jurisdiction.'" *Id.* (quoting *Harman*, 380 U.S. at 535) (emphasis added). Yet the City offered absolutely *no* limiting construction, obvious or otherwise.

In sum, the City has "offer[ed] no credible argument or interpretation of [the ordinances] to support [its] abstention argument." *Baran*, 57 F.3d at 443. And the City's theory—that *Pullman* can be applied if the City can simply find old charters and ordinances that "Texas state courts have never resolved"—would make the exception swallow the rule. *See* ROA.2856.

---

[17] The one exception is for the 1986 Ordinance. The City suggested in a footnote that the 1986 Ordinance does not confer limited-purpose jurisdiction status on the Shoreline Properties because it refers to the "special status" of the properties without using the term "limited purpose jurisdiction." *See* ROA.2858–59 & n.6. The footnote also noted that the ordinance refers to the 1928 Charter to define City limits, and that the "purpose for the alleged limited purpose jurisdictional status is never stated." *Id.* However, the Homeowners note that, because the 1986 Ordinance's clearly declares the Shoreline Properties' *limited-purpose* jurisdiction, the 1986 Ordinance's reference to the 1928 Charter's City boundary line (504.9′) only emphasize that the City *never* intended to exercise full regulatory and taxing authority over the Shoreline Properties—even in its 1928 Charter.

34

That theory is exactly backwards, as "[a]bstention is, of course, the exception and not the rule." *City of Houston*, 482 U.S. at 467.

## II.     The totality of the circumstances strongly weighs against abstention.

Even if the City had identified open questions, far more is needed to justify *Pullman* abstention. Precisely because it is "an extraordinary decision to stay federal adjudication," this Court has repeatedly made clear that *Pullman* abstention "requires more than ambiguity in state law and a likelihood of avoiding constitutional adjudication." *La. Debating & Literary Ass'n*, 42 F.3d at 1491 (quoting *Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. 1981)).

Even when (unlike here) *Pullman*'s initial criteria are satisfied, federal courts "must carefully assess the totality of the circumstances presented by a particular case." *Id.* And this "requires a broad inquiry which should include consideration of the rights at stake and the costs of delay pending state court adjudication." *Id.*; *Baran*, 57 F.3d at 442.

This analysis is essential because, as the Supreme Court has frequently warned, "abstention operates to require piecemeal adjudication in many courts, thereby delaying ultimate adjudication on the merits for an undue length of time." *See Baggett v. Bullitt*, 377 U.S. 360, 378–79 (1964) (cleaned

35

up). This concern—protracted, piecemeal adjudication—very often outweighs whatever harms are to be avoided by abstention, even when abstention would otherwise be appropriate. *See id.*; *Griffin v. Cnty. Sch. Bd.*, 377 U.S. 218, 229 (1964); *Mayor of City of Philadelphia v. Educ. Equality League*, 415 U.S. 605, 628 (1974); *Bellotti v. Baird*, 428 U.S. 132, 150 (1976). Here, the totality of the circumstances, including the harms of needless cost and delay, strongly weigh against abstention.

First, consider the time and money already spent on this case. This litigation began in state court nearly five years ago.[18] And since day one, the Homeowners have consistently been told they were in the wrong forum. The Homeowners agreed to abate that state court proceeding because TCAD would not adjudicate the boundaries of the City's taxing jurisdiction, and the Homeowners could not sue the City in that forum. *Bailey v. Travis Cent. Appr. Dist.*, No. D-1-GN-20-006182 (53rd Dist. Ct., Travis County, Tex.

---

[18] *See Mayor of City of Philadelphia*, 415 U.S. at 628 (finding abstention inappropriate "nearly three years after the filing of the complaint"); *Frederick L. v. Thomas*, 557 F.2d 373, 383 (3d Cir. 1977) (affirming the district court's decision not to abstain when "the motion for abstention was made more than one year after the complaint was filed"); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329 (1964) (finding abstention "unwarranted" where "the litigation had already been long delayed, despite the plaintiff's efforts to expedite the proceedings").

Jan. 26, 2021) (granting joint motion to abate because of the Tax Code's "prohibition against joining the City of Austin").

After suing the City in federal court, the City filed a motion to dismiss, which the district court granted based on one of the grounds the City raised—the TIA.[19] The district court's erroneous ruling required an appeal to this Court, where the Homeowners prevailed. The case returned to the district court, which granted a *second* motion to dismiss based on one of the multiple abstention grounds raised by the City. Nearly five years in—with the Homeowners having spent significant sums litigating this case in state court, before a federal magistrate judge, a federal district judge, and this Court (twice)—it is past time to get to the merits, not start again from scratch.

The Homeowners should not be forced to file a third lawsuit in a third forum after five years of litigation, merely because the City thinks its own

---

[19] The City's first motion to dismiss also invoked *Pullman* abstention, *Burford* abstention, the political question doctrine, and an amorphous "comity" doctrine that supposedly may bar tax challenges even when the TIA does not apply. All of these arguments are cut from a similar cloth. They are all directed at deferring to state courts and discouraging federal courts from exercising their jurisdiction. In short, the City's entire litigation strategy has been to escape *Pullman*'s primary jurisprudential guardrails: "Federal courts . . . have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint*, 571 U.S. at 77 (quoting *Cohens*, 19 U.S. (6 Wheat.) at 404)).

(legally irrelevant) past actions lack clarity. If this Court affirms the district court's judgment, five years and hundreds of thousands of dollars will have been wasted.

Second, there are no significant state interests that favor abstention here. The core concern of abstention is federalism—pitting one sovereign against another by asking a federal court to overturn state law. WRIGHT & MILLER, AVOIDANCE OF FEDERAL CONSTITUTIONAL QUESTIONS—WHEN ABSTENTION REQUIRED, 17A FED. PRAC. & PROC. JURIS. § 4242 (3d ed.). But here, the Homeowners have not challenged any *state* law as unconstitutional; their challenge is to a municipal ordinance. In fact, the City has not even identified one open question of *state* law. Every question the City has identified deals entirely with its own ordinances or charters.

Certainly, the City is a creature of the state. And the Homeowners are not arguing that municipal ordinances are never considered state law for the purposes of *Pullman*. But the case for *Pullman* is seriously weakened when, as here, the plaintiff seeks to vindicate state law rather than challenge it. And surely the case for abstention is weaker still where any ruling on the purportedly unclear issue of municipal law could not possibly impact anyone outside of a narrow strip of real estate alongside that municipality. *See Guiney*

*v. Roache*, 654 F. Supp. 1287, 1299 (D. Mass. 1987), *reversed on other grounds*, 833 F.2d 1079 (1st Cir. 1987) (explaining that the "federalism concerns" underlying *Pullman* "are arguably more limited" where the "enforcement at issue" was "that of a municipal police department rather than that of a state agency").

Third, it is far from clear that there is a state forum in which the Homeowners can bring *all* their claims. After beginning this litigation in state court, the Homeowners filed this lawsuit in federal court, in part because the TCAD forum in which the Homeowners began may be the exclusive state court forum for at least some of the Homeowners' claims. *See* TEX. TAX CODE § 41.41(a)(6); *id.* § 25.22.[20] In contrast, all of the Homeowners' claims can be brought in federal court. And the standard under *Pullman* is not whether the Homeowners *might* have a speedy and efficient remedy in state court, but whether it is "clear" that such a remedy exists. *Hillsborough Township v. Cromwell*, 326 U.S. 620, 628 (1946). Here, that's not the case. It makes no sense to force the Homeowners to litigate two separate lawsuits in two separate state forums—merely because the City thinks that *some* of the Homeowners' claims might implicate open state-law questions.

---

[20] *See supra*, note 3.

Finally, the R&R also claimed that adjudication of the Homeowners' claims would risk an "advisory" opinion, citing *Moore v. Sims*, 442 U.S. 415, 428 (1979). ROA.2821. But that's wrong. In *Moore*, the Supreme Court placed this concern of advisory opinions squarely in the context of "broad-based challenges" to "state statutes" and explained that the dangers of an advisory opinion "increase with the breadth of the challenge." *Moore*, 442 U.S. at 428. And that makes sense. Where plaintiffs challenge state laws with state-wide application, there is a risk that the federal court will be forced to weigh in on an issue that will be litigated again and again in state courts. But here, the Homeowners do not challenge *any* state statute. And neither the City nor the R&R has pointed to *any* Texas statute with uncertain meaning or uncertain import to this case. This case is about whether a particular municipal ordinance and its enforcement were lawful. That ordinance impacted only a particular set of property owners along the shores of Lake Austin, and (as this case's unwieldy caption shows) the Homeowners have sought to include all interested parties in this lawsuit.

There is no danger that a dozen other lawsuits will spring up across the state raising these same issues—or that those state-court judges will be wringing their hands because there is no binding state-court decision to guide

40

them. Even if this case did raise difficult questions of state law that could moot the Homeowners' federal claims (it does not), the totality of the circumstances makes this case is an exceptionally poor vehicle for abstention.

## CONCLUSION

After the City's second motion to dismiss, which the magistrate judge recommended granting on only *Pullman* grounds, the Homeowners asked the district judge to rule on *all* the City's arguments for dismissal, rather than continue ruling on those non-merits arguments piecemeal. ROA.2846–47. The district court declined to do so. ROA.2883–84. The problem with this *seriatim* game of whack-a-mole—in which the Homeowners must appeal each of the City's discrete (and erroneous) arguments one at a time—is not simply that it threatens to turn this case into *Jarndyce v. Jarndyce*.[21] The broader problem is that this piecemeal approach effectively deprives plaintiffs with viable § 1983 claims of their access to federal court. To avoid 10 more years of fighting over the correct forum, and because there is no valid reason for the federal courts to deny the Homeowners' federal claims, the Homeowners respectfully ask this Court to reverse the district court's judgment and to instruct the district court to proceed to the merits.

---

[21] *See* Charles Dickens, *Bleak House* 51-52 (1853) (Penguin Classics 1985).

41

Respectfully submitted,

*/s/ Christopher S. Johns*
Christopher S. Johns
Texas Bar No. 24044849
Bill Cobb
Texas Bar No. 00796372
Michael C. Cotton
Texas Bar No. 24116229
COBB & JOHNS PLLC
13341 West US-290, Building 2
Austin, Texas 78737
512-399-3150
512-572-8005 fax
chris@cobbjohns.com
bill@cobbjohns.com
michael@cobbjohns.com

Ernest A. Young
Texas Bar No. 00791972
3208 Fox Terrace Drive
Apex, North Carolina 27502
919-360-7718
young@law.duke.edu

*Attorneys for Appellants*

42

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2025, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Christopher S. Johns*
Christopher S. Johns

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 9,526 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using version 16.0 of Microsoft® Word for Windows in 14-point Equity Text A font.

*/s/ Christopher S. Johns*
Christopher S. Johns